Josie Newell, Administratrix, Appellee, v. Cleveland, Cincinnati, Chicago & St. Louis Railway Company, Appellant.

1. EVIDENCE—*when coroner's verdict is admissible.* In an action for wrongful death, the verdict of the coroner's jury, finding that deceased came to his death by being run over by defendant's switch engine, is properly admitted when there is proof that it was filed in the office of the circuit clerk.

2. INSTRUCTIONS—*as to presumption in favor of care for self-preservation.* In an action for wrongful death, an instruction to the effect that if no one saw the accident, the jury are warranted in finding from the instinct of self-preservation that deceased was in the exercise of ordinary care for his own safety, unless the jury believe deceased was under the influence of liquor so as to make him incapable of exercising ordinary care, or to make him reckless, or that there were other circumstances indicating want of ordinary care, may be given.

3. APPEALS AND ERRORS—*remarks of counsel.* In an action for the death of plaintiff's intestate, killed by defendant's switch engine, a remark by plaintiff's counsel in his closing argument that, "I have my ideas about this case, notwithstanding what the employes of the defendant might have, who had to swear this to hold their job with the company," though improper, is not reversible error when promptly withdrawn on objection of opposing counsel and the jury are instructed to disregard it.

4. APPEAL AND ERROR—*when judgment is sustained.* In an action for wrongful death, where deceased was killed by defendant's switch engine, a judgment for $1,300.00 is sustained where it appears from a consideration of the whole case that substantial justice was done.

Appeal from the Circuit Court of Saline county; the Hon. A. W. LEWIS, Judge, presiding. Heard in this court at the October term,

Newell v. C., C., C. & St. L. Ry Co., 179 Ill. App. 497.

1912.   Affirmed.   Opinion filed March 10, 1913.   Rehearing denied
May 28, 1913.

P. J. KOLB and W. F. SCOTT, for appellant; ROBERT
J. CARY, of counsel.

SIEGEL CAPEL and DORRIS & LEWIS, for appellee.

MR. JUSTICE HIGBEE delivered the opinion of the
court.

George Newell was run over and killed by a freight
engine or car on the tracks of appellant, in the city of
Harrisburg, Illinois, October 2, 1910.  Appellee, Josie
Newell, his widow, was appointed administratrix of
his estate and as such brought suit to recover dam-
ages for his death.  The declaration which consisted
of three counts charged first, that while Newell, with
due care was attempting to cross appellant's railroad
on a street of said city, the servants of appellant so
carelessly and improperly propelled and ran a loco-
motive engine on said railroad, upon and against him,
that he was thereby killed; second, that appellant
failed to comply with the statutory duty to ring the bell
or sound a whistle before reaching the crossing; and
third, that appellant failed to ring a bell or sound a
whistle a reasonable time before starting the engine
within the corporate limits of said city.

Appellant seeks by this appeal to reverse the judg-
ment of the court below in favor of appellee for
$1,300.  One of the grounds relied on by appellant, is
that the facts in the case did not warrant a recovery
by appellee because they failed to show either neg-
ligence on the part of appellant or due care on the
part of appellee.  As disclosed by the proofs, appel-
lant's right of way and tracks run nearly north and
south across Walnut street, a street running east and
west in said city of Harrisburg.  Walnut street was
crossed by the main track of appellant's railroad and
some four switches, one of which ran to a flouring

mill, located a short distance south of the street and east of a switch track, that led off to a coal mine. North of the street some 200 feet, another switch left the flouring mill track on the south and extended in a southerly direction to a coal mine, known as O'Gara Mine No. 2. Harrisburg is a county seat with a population of some 7,000 inhabitants. The business part of the city was located and the greater number of the inhabitants resided, west of the railroad, but there were quite a large number of people living east of the tracks, who together with people residing in neighboring towns in that direction, crossed over the tracks at Walnut street in going to and coming from the city. Walnut street was 66 feet wide and the center of it west of the track, was paved for the width of 25 feet. There were no sidewalks across the railroad tracks and pedestrians were accustomed to cross over the tracks in the middle of the street where the teams traveled.

Deceased was a coal miner, living at Gaskins City, one mile east of Harrisburg and worked in a mine located within the city limits. He was 48 years of age and earned from $2.49 to $2.70 a day, when the mine was running, which was about half the time. He was seen in Harrisburg during the afternoon, where he appears to have taken one or more drinks of whiskey. About 3 P. M. he left the city and went home upon an errand but afterwards came back again. Where he went and what he did after his return to the city, is not clearly shown by the evidence. At about 6:30 P. M. he was seen near a restaurant, in the neighborhood of appellant's depot about a block south of the street crossing in question, and was later seen going along the railroad tracks towards Walnut street. At about 7:30 P. M. he was seen east of the railroad track on Walnut street some 50 or 60 feet from the crossing, where he met and spoke to some friends, and then proceeded towards the crossing. Shortly afterwards his body was found between the rails of the track leading

to the mill a little south of the center of Walnut street, while the head, which had been severed from the body, was found at a point west of the track and further north, but within the limits of the city. There was evidence tending to show that his hat was found still further north beyond the limits of the city, and also further evidence that it was found within some 18 inches of his head. No one saw Newell at the time he was killed, and the exact manner in which he was struck and run over, cannot be ascertained.

A yard engine of appellant in charge of a switching crew, left the round house about three quarters of a mile north of the Walnut street crossing at 7 o'clock in the evening and came south towards the crossing. The crew proceeded with their work and in the course of it, switched a car from a track west of the main track to the flouring mill track, which was the second track east of the main track. The engine was coupled to the south end of the car, with the head of the engine towards the car and the tender towards the south. In this position the car was hauled south across Walnut street on to the main track and stopped a short distance south of the street. It was then pushed north again, over what was known as a cross-over, to a team track, south of the main track, recrossing Walnut street in its course and proceeding to a point north of a switch, leading off of that track to the mill track further east. In order to place the car where the crew wanted it, it was desired to shift the engine from the south to the north end of it and this was done by making what is called a running switch. After the engine and car had gotten in motion, the car was cut loose and the engine proceeded south down the mill track ahead of the car, a switch was then thrown behind the engine, allowing the car to pass on the track leading to O'Gara Mine No. 2.

There is some controversy as to whether the engine stopped before it reached the Walnut street crossing and later proceeded at a slower rate of speed to the

south side of the street, or whether it crossed over the street as a part of its running switch without making any stop before reaching it. In any event, almost immediately after it stopped south of the street, an alarm was given that a man had been killed and the crew, upon going back to the street, found the body and head of deceased as above described.

If the engine in fact stopped north of Walnut street after cutting loose from the car and then again went south preceded by the conductor and the brakeman at the rate of from three to four miles an hour as claimed by some of the witnesses for appellant, it seems remarkable that no one connected with the crew saw deceased before or at the time he was struck. But it is evident beyond controversy, from all the surroundings that he was struck and run over by the tender and engine and the plain inference, from the evidence, is that he was struck while he was on the street crossing. There was evidence tending to show that deceased was intoxicated or was under the influence of liquor shortly prior to his death, and there was an odor of whiskey at the place where the body lay.

On the trial the last witness, who saw him alive, and only a short time before he was struck, testified that he was sober. The evidence as to the speed at which the engine was running, whether the bell was ringing or whistle sounding and whether there was a light on the south end of the tender, was conflicting and irreconcilable, but upon the whole appears to us sufficient to sustain the verdict in favor of appellee.

Appellant complains that the verdict of the coroner's inquest upon the deceased, was improperly admitted in evidence, both because the verdict offered in evidence did not contain the file mark of the circuit clerk signed by said clerk and because it contained statements beyond the province of the jury. The proofs in the case plainly show that the verdict was filed in the office of the circuit clerk, and the finding of

the jury, which was the deceased came to his death by being run over by an engine of appellant while it was "in the act of making a running switch on the back track at Walnut street crossing in the city of Harrisburg, county of Saline, state of Illinois," does not appear to us to contain matter rendering it inadmissible as evidence in this case. It does not attempt to charge appellant with negligence in causing the death of Newell but simply states the occurrence without seeking to fix legal responsibility for the injuries inflicted. Under these circumstances the verdict was properly admitted.

The complaint is made by appellee of instruction No. 10 given for appellee. That instruction was as follows: "Upon the question of whether George Newell was in the exercise of ordinary care for his own safety, when he lost his life, the court instructs you that if you believe from the evidence, that he was killed while attempting to cross the railroad track on Walnut street, and that no one saw the accident, then you are warranted in finding from the well known instinct, which men ordinarily have to try to preserve their lives and not destroy them, that he was in the exercise of ordinary care for his own safety; unless you further believe from the evidence that said George Newell was under the influence of intoxicating liquor to such an extent as to render him incapable of exercising such ordinary care or as to make him reckless or that there were other circumstances indicating a want of such ordinary care."

In Illinois Cent. R. Co. v. Nowicki, 148 Ill. 29, it was held that where no one saw the killing, direct testimony as to care was not necessary, but might be inferred from the circumstances of the case as shown by the evidence.

In Collison v. Illinois Cent. R. Co., 239 Ill. 532, it is stated in the opinion: "It is true that there is an instinct of self-preservation common to all and that such instinct raises a presumption against an affirma-

tive act tending to destroy life, such as suicide, and raise a presumption as to the conduct of a person where there is a known danger to be avoided.'' And further ''where there is no eye-witness to the killing of a person, his administrator may establish the exercise of ordinary care on the part of the deceased by the highest proof of which the case is capable.''

The court in Chicago Terminal Transfer R. Co. v. Reddick, 131 Ill. App. 515, lays down the rule to be that ''the presumption of law must be where the fact is not susceptible of direct proof that a person 'does not voluntarily incur danger or the risk of death,' and that in view of the known conditions he was exercising due care for his own safety.'' To the same effect is the language of the court in Chicago & E. I. R. Co. v. Heerey, 203 Ill. 492, where the court, speaking by Mr. Justice Cartwright says: ''It is true that where the fact is not susceptible of direct proof it may be inferred from the circumstances, and the plaintiff may be aided by the presumption that a person does not voluntarily incur danger or the risk of death. But that does not effect the question where the burden of proof rests. In a case where a person is killed and there are no eye-witnesses to the accident, there is no dispute that the burden of proof rests on the plaintiff to show due care on the part of the deceased, but if there are no eye-witnesses and no direct proof he is entitled to the benefit of the presumption.''

We think the instruction falls within the general rule laid down in the above cases and that the court did not err in giving it.

The criticism of other instructions given for appellee have been considered by us but we do not think they are well founded, nor are they of sufficient importance to necessitate discussion here.

The principles declared in appellant's refused instructions appear so far as they are correct, to have been fully covered by the instructions given for it.

Complaint is made by appellant of the following

language used by one of the attorneys for appellee in his closing argument to the jury: "I have my ideas about this case, notwithstanding what the employes of the defendant might have, who had to swear this to hold their job with the company." Appellant objected to this remark and thereupon the counsel who made it, stated to the court "I withdraw the remark." Counsel for appellant then said to the court, "I desire a ruling upon this question" and the court replied, "I understand the remark is withdrawn." This remark was improper and stated as a fact, something that was not in proof. It could only have been made for the purpose of improperly influencing the jury. Counsel for appellee recognized this fact and to avoid the effect of the imprudent remark, offered an instruction which was given by the court telling the jury that they should not consider any statement made by counsel in argument of the cause, not based on the testimony, and that any statement made by counsel in argument of the cause, which had been withdrawn, should not be considered by them in arriving at a verdict. It has become more and more the custom of courts of appeal to take notice of improper remarks of attorneys, in a case, uttered for the purpose of gaining undue advantage over their opponents, and in many cases their clients have been made to suffer by the reversal of a judgment on that account. We believe the general effect of such decisions has been to elevate the practice and to further the cause of justice. But while we have given the words used in this case, careful attention, we do not think in view of the fact that they were promptly withdrawn by the counsel uttering them, when his attention was called to them, and the further fact that the same counsel caused an instruction to be given, telling the jury to disregard them, that the conditions are such as to warrant us in causing the client to suffer for the improper remarks of her attorney. We are especially inclined to this conclusion for the reason

that the verdict in this case is, under all the circumstances, so small as to warrant the belief that the jury could not have been seriously influenced by the remarks referred to.

A consideration of the whole case leads us to the belief that substantial justice has been done and the judgment of the court below will therefore be affirmed.

*Judgment affirmed.*